IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                                  Criminal No. **3:22CR152**

ROSCOE C. COPELAND,

    Petitioner.

## MEMORANDUM OPINION

Roscoe C. Copeland, a federal inmate proceeding *pro se*, filed this 28 U.S.C. § 2255 motion

to vacate, set aside, or correct his sentence. (ECF No. 82.) In his lengthy and repetitive § 2255

motion, Copeland contends that he is entitled to relief on the following nine grounds:[1]

Claim One: "Movant Copeland states that his former attorney provided him with ineffective assistance of counsel by failing to conduct legal research, failing to thoroughly review Indictment, and failing to file a motion to dismiss fatally defective Count One conspiracy." (*Id.* at 4.)

Claim Two: "Movant Copeland asserts that his guilty plea was tainted by ineffective assistance of counsel." (*Id.* at 8.) Copeland's attorney "failed to discuss the evidence," and he "fail[ed] to adequately consult with Copeland [to] learn the facts." (*Id.* at 10–11.)

Claim Three: "Movant Copeland contends that his former attorney provided him ineffective assistance of counsel by failing to adequately and effectively conduct pre-trial investigation of the fraud cause prior to advising Copeland to accept the Government's Plea Agreement and plead guilty." (*Id.* at 13.)

Claim Four: "Movant Copeland argues that his former attorney provided him with ineffective assistance of counsel by failing to present evidence to establish a viable 'good faith' defense." (*Id.* at 18.)

Claim Five: "Movant Copeland argues that the Government violated his Fifth Amendment rights by failure to disclose and the suppression of exculpatory evidence . . . and prejudice ensured in violation of the U.S. Supreme Court's ruling in *United States v. Bagley*, 473 U.S. 667, 682 (1985)." (*Id.* at 24.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the capitalization, punctuation, and spelling in quotations from the parties' submissions.

Claim Six:     "Movant Copeland argues firmly that the Government committed prosecutorial misconduct [] which entitles Copeland to have Count 1, conspiracy to commit wire fraud guilty plea withdrawn and the Indictment dismissed with prejudice in the matter herein." (*Id.* at 28.)

Claim Seven:   "Movant Copeland argues firmly that ex parte communications occurred regarding his criminal case between the Court and [Assistant U.S. Attorney Brian] Hood, thus, the Court's impartiality might reasonably be questioned in violation of 28 U.S.C. [§] 455(a); and his Fifth Amendment Due Process Clause rights . . . ." (*Id.* at 33.)

Claim Eight:   "Movant Copeland argues that his former attorney provided him with sentencing phase ineffective assistance of counsel" (*id.* at 39), by:
(a) "[f]ailing to object to [the] Section 3B1.1 aggravating role adjustment" (*id.* at 41);
(b) "[f]ail[ing] to object to the Court not properly considering a valid national disparity argument" (*id.*);
(c) [f]ailing to argue that "the Court should consider and impose a federal sentence . . . to satisfy the goals of . . . Section 3553(a)(2)" as he and his co-defendant "should receive similar sentences" (*id.* at 42); and,
(d) "[f]ail[ing] to object [to the] Court relying upon impermissible factors to fashion" his sentence (*id.* at 43).

Claim Nine:    "Movant Copeland argues that his former attorney provided him with ineffective assistance by erroneously advising him that there were no viable claims that could be raised on appeal in light of appeal waiver provision." (*Id.* at 45.)

The Government has filed a response, (ECF No. 92), to which Copeland has replied, (ECF No. 98). Copeland also filed a motion for prompt disposition. (ECF No. 99.) Both the § 2255 motion (ECF No. 82) and his subsequent motion (ECF No. 99) will be denied.

## I.    PROCEDURAL HISTORY

While Copeland's § 2255 motion is long, his claims lack merit. Despite pleading guilty, the crux of Copeland's § 2255 motion is a continued attempt to contest his guilt and to cast all the blame on other individuals and companies who were not indicted in this Court. The Court must nevertheless set forth the lengthy procedural history to provide context for its legal analysis.

## A.    Indictment and Guilty Plea

On October 4, 2022, the grand jury charged Copeland, and his co-defendant, Dawnn Long, with conspiracy to commit wire fraud, pursuant to 18 U.S.C. § 1349 (Count One) and wire fraud, pursuant to 18 U.S.C. §§ 1343 and 2 (Count Two).  (ECF No. 3, at 1.)  On August 2, 2023, Copeland entered into a plea agreement in which he agreed to plead guilty to Count One.  (ECF No. 34 ¶ 1.)  In the plea agreement, Copeland agreed that he understood that he could receive a maximum sentence of twenty years for Count One.  (*Id.*)  The plea agreement also contained a stipulation that the parties would recommend to the Court that Copeland's base offense level under the United States Sentencing Guidelines ("USSG") would be 7 and that the loss from the wire fraud would be more than $550,000 but less than $1,500,000 for an offense level of 14.  (*Id.* ¶ 4.)  At the end of the plea agreement, Copeland specifically agreed that:

> I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal Indictment.  Further, I fully understand all rights with respect to 18 U.S.C. § 3553 and the provisions of the Sentencing Guidelines Manual that may apply in my case.  I have read this Plea Agreement and carefully reviewed every part of it with my attorney.  I understand this agreement and voluntarily agree to it.

(*Id.* at 13.)  A statement of facts accompanied the plea agreement, and Copeland "agree[d] that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence":

> 1.    The defendant, ROSCOE CLEVELAND COPELAND, was the founder and chief executive officer of a company named Alexis Realty Solutions LLC (hereafter "ARS").  COPELAND's codefendant, Dawwn Lynn Long, was ARS's chief operating officer.  COPELAND registered ARS in the State of Michigan.  At all times relevant to the offenses alleged in the Indictment, both COPELAND and Long resided in the Detroit, Michigan area.
>
> 2.    COPELAND and Long, doing business as ARS, purported to be an alternative funding source for prospective buyers (alternatively referred to herein

3

as "customers") seeking loans for real estate purchases. The defendants claimed that ARS was a private lender with no middleman that would "search through many variations of security instruments" to find funding for customers. COPELAND described ARS's operational model as being a "bond funding" program that accessed purported "Reg D" or "144A" bonds at discounted rates to obtain money for both residential and commercial real estate loans.

3.      Prospective borrowers from ARS paid an upfront fee, typically 3% of the loan amount, to "secure a bond" necessary to obtain the loan. ARS offered very competitive interest rates to their customers. Many customers were offered interest rates as low as 1% for a traditional 30-year fixed mortgage. Additionally, ARS catered to customers who had poor credit ratings or were otherwise unable to qualify for a loan from retail banks or other traditional funding sources.

4.      COPELAND and Long recruited individuals known as "consultants" to work for ARS. The task of the consultants, many of whom were brokers or agents working in the real estate business, was to find prospective borrowers and direct them to ARS. COPELAND and Long told consultants that ARS would be paid "on the back end" after loans were funded, and the defendants generally told the consultants that they would receive a percentage of ARS's cut on the back end. Several consultants were paid from the borrowers' advance fees even though no loans were []ever funded.

5.      During the operation of the conspiracy, COPELAND and Long knowingly made repeated false statements to both perspective borrowers and consultants. These misrepresentations included, among others, that: 1) the advance fees paid by customers would be held in escrow or a secured trust account; 2) the customer's advance fees would be repaid in full if their loans did not fund within a set period; and 3) ARS was a private lender with no middleman.

6.      Contrary to COPELAND's and Long's misrepresentations that ARS had no borrowing middleman, from early 2016 through January 2017 the defendants sought loan funding from an individual identified herein as "KDC." KDC also described using a "bond funding" program that would purchase "Reg D" or "144A" bonds at a discount and later "monetize" these bonds and sell them at a significant premium, creating large returns. During this time period, ARS referred 33 prospective borrowers to KDC and several other individual funding sources for loans. These 33 prospective borrowers wired over $900,000 to KDC and the other individuals. None of the 33 individuals ever obtained a promised loan, and the majority were not repaid any of their advance fees.

7.      In [or] around January 2017, COPELAND and Long stopped referring prospective borrowers to KDC for loans and sought out other sources of financing. Even though they were actively searching for loan suppliers, both COPELAND and Long continued to tell new prospective borrowers and consultants that ARS was an original funding source with no middleman. They also repeated the false statements

4

that a borrower's advance fee would be held in escrow, and that their entire advance fee payments would be returned if the loan did not fund without a set time frame, which was typically represented as 45 to 90 days.

8. From January 2017, through July 31, 2017, a total of 24 prospective borrowers seeking loans from ARS wired approximately $656,070 in advance fees to a Huntington National Bank account with account number ending in 7299. The defendants promised customers that these funds would be held in escrow in this account. Defendant COPELAND was the sole signatory on the account. During the same time, COPELAND made numerous social media posts on Facebook and elsewhere with pictures of himself traveling, staying in luxury hotels, eating at high-end restaurants, and attending sporting events with expensive spectator arrangements. COPELAND paid for these personal activities using the advance fees ARS customers wired to the Huntington National Bank account. Many prospective borrowers who had not received loans as promised noticed these social media posts and were bothered by them. The defendants returned a total of $70,032 in advance fees to several customers. Huntington National Bank force closed the account on July 31, 2017, and issued COPELAND a cashier's check for $38,808.64 for the balance of funds in the account.

9. Following the closure of the Huntington National Bank account, the defendants opened an account with Bank of America (BOA) with account number ending in 0063. Both COPELAND and Long were signatories on the BOA account. COPELAND deposited the Huntington National Bank cashier's check for $38,808.64 into the BOA account. From August 1, 2017, through October 18, 2017, the BOA account received wire transfers totaling $53,968 from two additional ARS customers. Even though the defendants promised ARS customers that these funds would be held in escrow, Copeland personally received at least $10,800 and Long personally received at least $21,690 from customers' advance fees that were deposited in this BOA account.

10. One of these two customers paying into the BOA account, identified herein as "M.S.," resided in Norfolk, Virginia, which is in the Eastern District of Virginia. M.S. was recruited to be a customer of ARS by a consultant identified herein as "D.M." D.M. resided in Richmond, Virginia, which is also in the Eastern District of Virginia, at the time he recruited M.S. as a customer of ARS. Both M.S. and D.M. were located in the Eastern District of Virginia when they received ARS-related emails from Long. M.S. submitted several loan applications to ARS, which ultimately totaled a request for $2,038,885 for the purchase of four properties that M.S. intended to convert into housing for unhoused military veterans. M.S. paid a total of $35,000 in advance fees to ARS, making his last payment on October 18, 2017. M.S. never received his loan, nor was he ever reimbursed any of his advance fee payments.

11. During the period of January 1, 2017, through October 18, 2017, the 26 prospective borrowers from ARS paid a total of $710,038 in advance fees. None

of these customers obtained a loan through ARS. Some of the customers received partial repayment of their advance fees, which totaled $70,032. The total net loss to ARS customers was $653,250.

12.    In furtherance of the fraud scheme, COPELAND committed the following actions, among others:

a.    On or about December 8, 2016, COPELAND wrote an email to an ARS consultant identified herein as "M.J." stating that "the client's 2.5% deposit is totally refundable if there is an error on our private bank's behalf . . ."

b.    On or about March 4, 2017, COPELAND sent an email to multiple ARS consultants, including but not limited to those identified herein as "L.R.," "M.J.," "D.B.," and "S.A.," stating that ARS had sent aside $5 million in funding specifically toward the enhancement of Detroit, which was false.

c.    On or about April 18, 2017, COPELAND emailed a PowerPoint "pitch deck" to LONG and ARS consultants identified herein as "K.R." and "R.S.," stating that the client's initial deposit "remains in escrow until the funds are matured," which "could take as little as 21 days but is allotted 30-45 days."

d.    On or about July 27, 2017, COPELAND emailed a prospective ARS consultant identified herein as "C.N.," stating that ARS provided the best possible funding to clients and received a percentage on the back end of the loan once the loan had been funded.

e.    On or about September 15, 2017, COPELAND sent an email to an ARS consultant, who forwarded the email to an individual identified herein as "L.B.," who was both an ARS consultant and prospective borrower, falsely stating that loan funding for borrowers would be available the next week and that any borrower seeking a refund would be refunded the next week as well.

13.    On September 19, 2022, COPELAND was interviewed by a special agent with the Federal Bureau of Investigations about his participation in the ARS fraud scheme. COPELAND admitted that the advance fee payments from ARS customers were not placed in escrow. COPELAND admitted using advance fee payments for his personal expenditures, describing those expenditures as "pre-spending of unearned revenue." The defendant acknowledged that none of the customers' loans got funded, and that few customers received any of their advance fee payments back.

14.    This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

6

15.    The actions of the defendant, as recounted above, were in all respects knowing, deliberate, and voluntary, and were not committed by mistake, accident, or other innocent reason.

(ECF No. 35, at 1–6.)

During the Rule 11 hearing, Copeland agreed that he was testifying under oath and if he answered questions falsely, he could be prosecuted for making false statements. (ECF No. 86, at 5.) Copeland agreed that he had read the indictment, discussed the charge with his attorney, and agreed that he was "fully satisfied with the services and advice provided to [him] by Mr. Camden." (*Id.* at 8.) When asked whether "there [was] anything you have asked Mr. Camden, any questions you have asked him that he has been unable or unwilling to answer for you," Copeland answered, "No, sir." (*Id.*) Copeland also agreed that there was nothing he "ha[d] asked [counsel] to do that he ha[d] been unable or unwilling to do for [Copeland]." (*Id.* at 9.)

Copeland affirmed that he understood that he was charged with wire fraud and that the Court was not bound by the offense level and amount of loss that were stipulations in the plea agreement or that those stipulations meant that he would receive a particular sentence. (*Id.* at 9–10.) Copeland answered affirmatively when asked whether counsel had "gone over with [him] what the government ha[d] to prove for [him] to be found guilty of the charges." (*Id.* at 10.)

Copeland agreed that he had read and gone over the plea agreement with counsel, that counsel had explained the agreement to him "thoroughly," that Copeland had been able to ask counsel questions, and that counsel had answered his questions to Copeland's satisfaction. (*Id.* at 10–11.) Copeland agreed that he reviewed the Statement of Facts with counsel, that counsel had explained it to him, and that counsel has answered Copeland's questions regarding that document. (*Id.* at 11–12.) The Court briefly summarized the factual basis as follows:

> So what this statement of facts says is that you and Dawnn Lynn Long had a company called Alexis Realty Solutions, and essentially what it says—without

going into a whole lot of detail—is that you all had customers to whom you agreed that you would find financing for them to purchase real estate. And that it looks as through you might have been maybe taken in by someone yourself on this. But essentially it became clear that you all were not providing, were not going to provide financing to people, and that you took a lot of their money for yourself. Is that an accurate, but very brief, statement . . . of the facts?

(*Id.* at 12.) Copeland answered, "Yes, sir." (*Id.*) When asked by the Court whether he signed the statement of facts because its contents were true, Copeland also indicated:

> THE DEFENDANT: Yes, sir. We didn't—the intention wasn't to keep it for ourself, but that is actually what ended up happening.
>
> THE COURT: So, in other words, at some stage you were hoping this would pay out, and you would get money for people.
>
> THE DEFENDANT: Yes, sir. All the way to the end.
>
> THE COURT: As it turned out that stage never came to fruition?
>
> THE DEFENDANT: Yes, sir. Money that was already spent was already spent, so yes, sir.
>
> THE COURT: And money that was set aside for these people for their loans actually went to you and Ms. Long; is that right?
>
> THE DEFENDANT: The remaining balance that we didn't send to the other individuals you spoke of.
>
> THE COURT: Anything in the statement of facts that is not true?
>
> THE DEFENDANT: No, sir. No.
>
> THE COURT: Okay. You are pleading guilty because you are in fact guilty?
>
> THE DEFENDANT: Yes, sir.

(*Id.* at 12–13.)

Copeland agreed that counsel had "gone over with [him] the evidence he th[ought] the government could present if this case went to trial," and agreed that he had given counsel his "side of the story." (*Id.* at 14–15.) Copeland also indicated that he had discussed with counsel "whether

8

in [counsel's] judgment [Copeland] was guilty of this charge." (*Id.* at 15.) Copeland agreed that it was in his best interest to plead guilty instead of going to trial, that he was pleading guilty of his own free will, and that he understood that he could receive a maximum of twenty years in prison, but that "there [was] no agreement about sentencing in this case." (*Id.* at 16, 17.)

The Court also asked Copeland whether he understood that by pleading guilty that he had "given up pretty much any right . . . to appeal any sentence [the Court gave] him in this case," and Copeland answered in the affirmative. (*Id.* at 23.) Copeland agreed that, by pleading guilty, he was giving up his right to a trial and giving up the right that the government must prove him guilty beyond a reasonable doubt. (*Id.* at 23–24.) Copeland agreed that by pleading guilty he was giving up his right to subpoena witnesses, the right to obtain certain documents or object to them, and the right to see and question anyone who testified against him. (*Id.* at 24–25.) The Court also explained to Copeland:

> In order to plead—in order to find or to prove that you are guilty the government has to prove the following things. First of all, there was a conspiracy. They have to prove that you or someone else conspired to commit an offense to commit wire fraud. And a conspiracy means that you and somebody else agreed to do that, and then took some steps to try to do that.
>
> Second, that you knew what you were trying to do was unlawful. That you knew it was illegal to illegally get some money from people. And third, you did it willfully. You knew what you were doing when you entered into this agreement, or during the course of the agreement. Sometimes these agreements arise and as you are going along in the process what starts off as somewhat innocent, during the process it turns bad and things go wrong.
>
> Do you agree the government could prove all of those elements beyond a reasonable doubt?

(*Id.* at 26–27.)

Copeland responded: "Yes, sir." (*Id.* at 27.) When asked if he had any questions about his "rights or the charges . . . or the sentencing procedures," Copeland indicated that he "understood

everything, clearly." (*Id.* at 28.) After speaking with his counsel, Copeland indicated that he was ready to proceed with his guilty plea. (*Id.*) The Court found that Copeland's guilty plea was knowing and voluntary, was supported by an independent basis of fact for each element of the offense, and that Copeland was aware of the nature of the charges and consequences of the plea and subsequently adjudged him guilty. (*Id.* at 29.)

**B.      Presentence Report and Objections**

Prior to sentencing, a Presentence Investigation Report ("PSR") was prepared. (ECF No. 50.) Copeland's base offense level was 7. (*Id.* ¶ 26.) Because the amount of loss was more than $550,000 but less than $1,500,000, his offense level was increased by 14. (*Id.* ¶ 27.) Copeland received a four-level increase because the offense resulted in substantial hardship to five or more victims. (*Id.* ¶ 28.) Copeland received another two-level increase due to his role in the offense as a leader or organizer. (*Id.* ¶ 30.) Copeland's Adjusted Offense Level was 27; however, he received a three-level deduction for timely acceptance of responsibility, resulting in a total offense level of 24. (*Id.* ¶¶ 32–36.)

The probation officer determined that Copeland's criminal history score was two, resulting in a Criminal History Category of II. (*Id.* ¶ 47.) With a Total Offense Level of 24 and a Criminal History Category of II, Copeland's advisory guidelines range was 57 to 71 months of incarceration. (*Id.* ¶ 96.)

Counsel for Copeland filed objections to the PSR. Counsel argued that the four-level increase for substantial hardship to five or more victims was improper because there was no evidence or documentation that supported that enhancement. (ECF No. 50, at 34.) Counsel also objected to the two-level increase for Copeland's role in the offense as a leader or organizer, because essentially, Copeland believed that the other companies that Copeland and his co-

10

conspirator worked engaged in worse criminal activity, and instead, he should receive a mitigating role adjustment. (*Id.* at 35.)

### C. Sentencing

During sentencing, on February 15, 2024, counsel first argued that the aggravated role enhancement was improper because Copeland's role was minor in the larger fraud ring. (ECF No. 87, at 4–5.) Counsel argued that Copeland was "not the one that cooked up the scheme" or the "one that implemented" the fraud, and that those people "are still out there." (*Id.* at 7.) Counsel explained that Copeland kept in touch with the victims "because he feels bad about having spent the money they entrusted him with to get the business going" and he "believed this money was coming in that he would be able to repay." (*Id.* at 8.) The Court emphasized that Copeland was "living pretty high on the hog" on the victim's money. (*Id.* at 9.) Counsel explained that the money was spent on some entertainment but also on office space and "[t]rying to get the business really up off the ground." (*Id.*) The Court noted that Copeland brought his co-defendant, Dawnn Long, into the business, and counsel acknowledged that Copeland was her supervisor as the founder of the company. (*Id.* at 9–10.)

Counsel presented emails to show that the other companies that Copeland worked with "obscured the fraudulent nature of their business" in their communications and that Copeland and Ms. Long were "actually victims" of a larger fraud. (*Id.* at 10–12.) Counsel argued:

> Regarding the minor role, I think it really depends on the scale. If we are just looking at ARS then Mr. Copeland who founded the company, he is one owner of the company, he directed Ms. Long, at least in some of things she was doing. And so he would be a supervisor. But if you look bigger picture at this entire REG D scheme, Beauker, Gains, used an attorney, they used pretty professional-looking documents. I should say—a one percent mortgage on a 30 year mortgage is just impossible for me to believe. But people that really want to believe it, and people really wanted it to happen, especially, remember this all happens in Detroit where the depressed housing market and people trying to rebuild their communities, so they believed it. Even if it is—wouldn't be rational, Your Honor.

(*Id.* at 15.)  Counsel explained that despite Copeland being in the real estate business, he too believed that the one percent interest was real, and that they "had found a secret source for funding." (*Id.*)  Counsel argued that "[s]omebody thought up these REG E bonds in a way that would sound convincing" and that "[s]omebody went out and recruited Mr. Copeland and Ms. Long who then recruited others . . . [a]nd then disappeared with the money and got away while Mr. Copeland stuck around . . . ." (*Id.* at 17.)

After hearing arguments from the United States, the Court determined "that the request for a minor role characterization [was] clearly not appropriate." (*Id.* at 20.)  The Court explained:

> What [Copeland] did is not minor by any stretch of imagination.  It is pretty clear that once ARS became the operative entity in this case Mr. Copeland was the main operator of that entity, and that he was directing and supervising Ms. Long throughout this process.  So I find that he is a director or supervisor and he gets the aggravating role.

(*Id.*)  Counsel next argued that the substantial hardship for five or more people enhancement was improper.  (*Id.* at 21–23.)  The Court overruled that objection explaining that it had reviewed the victim impact statements and that more than five victims went through financial hardship because of Copeland.  (*Id.* at 23–25.)

Counsel argued that, under 28 U.S.C. § 3553, the sentence should be fashioned to "avoid unwarranted sentencing disparity." (*Id.* at 38.)  Counsel identified three individuals convicted in federal court in Michigan with losses attributable to them of between 6.4 and 1.6 million who received sentences of home confinement and probation.  (*Id.* at 38.)  The Court "commended [counsel] for finding that" but was unpersuaded by the comparison.  (*Id.* at 39.)  Counsel then argued that "[if] the Court does impose imposition, [he] would ask for a downward variance from 57 months." (*Id.* at 44.)

12

During his allocution, Copeland attempted to deny or minimize his guilt. The Court admonished him: "I would suggest that maybe you ought to focus less on why you are not guilty and more on why you think I ought to cut you a break," as "[w]e have already decided you are guilty." (*Id.* at 49.) The following exchange occurred:

THE DEFENDANT: I understand, and I accept full responsibility.

The COURT: No, you don't.

THE DEFENDANT: That is fine.

THE COURT: What I just heard was exactly the opposite.

(*Id.* at 49.) Copeland continued to try to make arguments about his liability, and the Court stated: "Mr. Copeland, you are making things worse for yourself. Why don't you tell me why I ought to cut you a break. Tell me how sorry you are about this, and why you think I ought to—tell me whatever it is you have got written down to read to me." (*Id.* at 50.) The Court confirmed with counsel that he had read Copeland's written statement "so [counsel] kn[ew] he [was] not hurting himself." (*Id.*)

After considering the § 3553(a) factors, the Court sentenced Copeland to 71 months of incarceration. (*Id.* at 57; ECF No. 69, at 2.) The Court then explained: "Sir, you have 14 days to appeal this sentence to the U S Court of Appeals for the Fourth Circuit. If you want to do that, you have to file a notice of appeal. You don't have to pay any money. The Court of Appeals will appoint a lawyer on your behalf." (ECF No. 87, at 60.)

Copeland filed no appeal. On February 18, 2025, the Court received Copeland's § 2255 motion.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

### A.   Standard for Ineffective Assistance Claims

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court modified the second prong of *Strickland* to require a showing that "there is a reasonable probability that, but for counsel's errors, [petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Any assertion by Copeland that he would not have pleaded guilty if he had received better assistance from counsel is not dispositive of the issue. *See United States v. Mora-Gomez*, 875 F. Supp. 1208, 1214 (E.D. Va. 1995). Rather, "[t]his is an objective inquiry and [highly] dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007) (internal citation omitted) (citing *Hill*, 474 U.S. at 59–60). The Court looks to all the facts and circumstances surrounding a

petitioner's plea, including the likelihood of conviction and any potential sentencing benefit to pleading guilty. *See id.* at 369–70.

In conducting the foregoing inquiry, the representations of the defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). In light of the strong presumption of verity that attaches to a petitioner's declarations during his plea proceedings, "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted). Thus, the Fourth Circuit has admonished that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 221–22. No circumstances exist here that would lead the Court to consider Copeland's prior sworn statements as other than truthful.

## B.    Pre-Guilty Plea Claims

In Claim One, "Movant Copeland states that his former attorney provided him with ineffective assistance of counsel by failing to conduct legal research, failing to thoroughly review Indictment, and failing to file a motion to dismiss fatally defective Count One conspiracy." (ECF No. 82, at 4.) Specifically, Copeland suggests that his Count One is defective because it failed to list a specific start date of the conspiracy and that "its open-ended rendering is fatally defective." (*Id.* at 5.) Contrary to Copeland's suggestion, "where a particular date is not a substantive element

15

of the crime charged, strict chronological specificity or accuracy is not required [in the indictment]." *United States v. Smith*, 441 F.3d 254, 261 (4th Cir. 2006) (quoting *United States v. Kimberlin*, 18 F.3d 1156, 1159 (4th Cir. 1994)). Counsel cannot be faulted for failing to move to dismiss the indictment on a meritless theory.

Copeland also argues that Count One was time-barred because the "last criminal conduct in furtherance of the scheme as it relates to Mr. Copeland was committed on September 15, 2017, . . . thus, this indictment was not filed until October 4, 2022, more than five years elapsed." (ECF No. 82, at 6.) Pursuant to 28 U.S.C. § 3282(a), the statute of limitations for Count One was five years. The last overt act of the conspiracy was January 22, 2018. (ECF No. 3 ¶ 6.d.)[2] The Indictment was returned on October 4, 2022, which was less than five years after the last act alleged. To the extent that Copeland contends that the Indictment did not specially name him past September 17, 2017, the premise of his claim lacks merit. "[A] defendant need not be involved in every phase of that conspiracy to be deemed a participant." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988). Moreover, "a defendant who [joins] a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he [is] responsible for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 568 U.S. 106, 111 (2013) (alteration in original) (internal citations omitted). The indictment returned on October 4, 2022, was timely filed. Counsel cannot be faulted for failing to raise a meritless argument.

Copeland fails to demonstrate any deficiency of counsel or resulting prejudice. Therefore, the Court will dismiss Claim One.

---

[2] The Government contends the last overt act in furtherance of the conspiracy was November 28, 2017. (*See* ECF No. 3 ¶ 6.c.) However, co-conspirator Long emailed a prospective borrower false information on January 22, 2018. (*See id.* ¶ 6.d.) Regardless of whether the final overt act occurred in November of 2017 or January of 2018, the Indictment was timely filed.

16

In Claim Two, "Movant Copeland asserts that his guilty plea was tainted by ineffective assistance of counsel." (ECF No. 82. at 8.) According to Copeland, his attorney "failed to discuss the evidence," and he "fail[ed] to adequately consult with Copeland to learn the facts." (*Id.* at 10–11.) Copeland suggests that although his case was deemed complex, he "was only able to speak to his former attorney maybe two or three times." (*Id.*) Little discussion is needed here. Copeland's statements are "'palpably incredible' and 'patently frivolous or false'" in light of his sworn assurances during his plea proceeding that he understood the evidence against him, that counsel had answered all of his questions, and that he was satisfied with counsel's services *See Lemaster*, 403 F.3d at 221 (citations omitted); (ECF No. 86, at 8–12, 14–15). Thus, because Copeland has demonstrated no extraordinary circumstances, "the truth of [his] sworn statements made during [the] Rule 11 colloquy [are] conclusively established. *Lemaster*, 403 F.3d at 222. Accordingly, Claim Two will be dismissed.

In Claim Three, "Movant Copeland contends that his former attorney provided him ineffective assistance of counsel by failing to adequately and effectively conduct pre-trial investigation of the fraud cause prior to advising Copeland to accept the Government's plea agreement and plead guilty." (ECF No. 82, at 13.) Specifically, Copeland faults counsel for "fail[ing] to secure the information regarding the individuals in his case who orchestrated the scheme who [sic] most of the funds to their escrow accounts: James Beucher, Tommy Gaines & Attorney Doug Davis[,] all of Atlanta. (*Id.* at 15.) Allegedly, "they signed the contract . . . and ensured the loans would be funded." (*Id.* at 15.)³ The Government counters that this information is irrelevant because

---

³ The record does not clearly reveal what role these individuals had in relationship to Copeland and Long's conspiracy. From counsel's arguments at sentencing, it appears that they were part of the larger bond funding scam. (ECF No. 87, at 15.) During sentencing, the Government explained that Copeland "was being held accountable for the most narrow set of facts

no matter what James Beucher, Tommy Gaines & Attorney Doug Davis would say about how the loans were funded it would not cleanse the defendant of his criminal liability for the fraudulent misrepresentations he made in furtherance of his scheme. COPELAND repeatedly made the following three false statements to prospective borrowers: 1) the advance fees paid by customers would be held in escrow or a secured trust account; 2) the customers' advance fees would be repaid in full if their loans did not fund within a set period; 3) ARS was a private lender with no middleman. These misrepresentations were included in the defendant's sworn Statement of Facts (ECF No. 35, ¶ 5), which COPELAND admitted was true during his Rule 11 colloquy. (Guilty Plea Transcripts, page 12.) The defendant's culpability for those misrepresentations operated independently of anything involving the three named individuals.

(ECF No. 92, at 12–13.) Copeland's criminal liability was based on his own lies to his customers. Counsel cannot be faulted for failing to further investigate these three individuals from Atlanta because whatever they may have done was irrelevant to Copeland's personal criminal actions. Copeland demonstrates neither deficiency of counsel nor resulting prejudice. Claim Three, therefore, will be dismissed for lack of merit.

In Claim Four, "Movant Copeland argues that his former attorney provided him with ineffective assistance of counsel by failing to present evidence to establish a viable 'good faith' defense." (ECF No. 82, at 18.) Copeland contends that this defense should have been made "due to a[] 'lack of intent' to defraud." (*Id.* at 21.) It is unclear *when* Copeland wanted his attorney to pursue a good faith defense. However, Copeland pleaded guilty, admitted his guilt, and agreed

---

that were beyond peradventure." (*Id.* at 18.) Copeland was not held liable for his actions with KDC and Kim Cain before January of 2017. (*Id.* at 18–19.) However, the Government explained that:

> We are going to hold him accountable only for January of 2017. That was how the conspiracy was constructed, because clearly Ms. Long and Mr. Copeland were working together. . . . So in this particular instance we have Mr. Copeland forming ARS, being its chief executive officer recruiting Dawn Long to work for him, supervising her, directing her to go to Georgia to try to find some additional funds. At no time during any of that was Mr. Copeland actually working for Tommy Gains or Doug Beauker or James Beauker or Doug Davis. That was a different side show.

(*Id.* at 19.)

that he knew what he had done was unlawful, even if the scheme had not begun that way, and that he had knowingly defrauded clients. (ECF No. 86, at 12–13, 26–27.) At most, it appears that Copeland continues to argue that he is not guilty, a claim that is belied by his validly entered plea agreement and the supporting statement of facts that he admitted were true and correct. Moreover, Copeland's counsel clearly was aware of and considered an argument that Copeland did not intend to defraud people, as he made this argument at sentencing in an attempt to mitigate Copeland's sentence. For example, counsel argued that Copeland kept in touch with his victims and "believed this money was coming in that [he] would be able to repay," he was not a "pure thief," and that he "thought [the mortgage scheme] was real." (ECF No. 87, at 8, 15.)

Finally, Copeland was well aware that counsel did not pursue a good faith defense prior to the entry of his plea, but nevertheless he still chose to plead guilty. Therefore, Copeland cannot demonstrate that but for counsel's failure to pursue a good faith defense, he would have insisted on not pleading guilty and proceeding to trial. Copeland fails to demonstrate how counsel was deficient regarding a purported good faith defense, or any resulting prejudice. Claim Four lacks merit and will be dismissed.[4]

### C.    Sentencing Claims

In Claim Eight, "Movant Copeland argues that his former attorney provided him with sentencing phase ineffective assistance of counsel" (ECF No. 82, at 39) by: (a) "[f]ailing to object to [the] Section 3B1.1 aggravating role adjustment" (*id.* at 41); (b) "fail[ing] to object to the Court not properly considering a national disparity argument" (*id.*); (c) failing to argue that "the Court should consider and impose a federal sentence . . . to satisfy the goals of . . . Section 3553(a)(2)"

---

[4] Copeland asks the Court to consider a defense expert's affidavit "who confirms that Mr. Copeland had a viable good-faith defense" according to Copeland. (ECF No. 98, at 12; *see* ECF No. 98-1.) Once again, Copeland fails to explain when he wanted counsel to make this defense, as after he pled guilty, any gave up his right to pursue defenses to the charge.

and that he and his co-defendant "should receive similar sentences (*id.* at 42); and, (d) "[f]ail[ing] to object [to the] Court relying upon on impermissible factors to fashion" his sentence (*id.* at 43). These arguments deserve little attention because they are utterly lacking in merit.

First, Copeland did not receive the enhancement pursuant to USSG § 3B1.1 that he suggests he did, that required five or more participants. *See id.* at § 3B1.1(b). Therefore, counsel cannot be faulted for failing to make a frivolous objection, and Copeland was not prejudiced. Copeland did receive an enhancement under USSG § 3B1.1(c) as an organizer or supervisor. However, counsel objected to this enhancement and argued extensively that it should not apply in Copeland's case. Copeland fails to identify with any specificity what further counsel should have argued. Accordingly, Copeland fails to demonstrate any deficiency of counsel or resulting prejudice and Claim Eight (a) will be dismissed

Copeland next suggests that counsel "fail[ed] to object to the Court not properly considering a national disparity argument." (ECF No. 82, at 41.) As discussed previously, counsel presented cases from other jurisdictions to show that similar defendants were sentenced to home confinement and probation to argue that Copeland should receive a similar sentence. (ECF No. 87, at 38.) However, the Court was unpersuaded. Copeland fails to identify with any specificity on what ground counsel should have "objected" to the Court's determination that it was unpersuaded. Counsel cannot be faulted for failing to make a futile argument. Accordingly, counsel was not deficient nor was Copeland prejudiced. Claim Eight (b) will be dismissed.

Copeland next contends that counsel rendered ineffective assistance by failing to argue that "the Court should consider and impose a federal sentence . . . to satisfy the goals of . . . Section 3553(a)(2)" and that he and his co-defendant "should receive similar sentences." (ECF No. 82, at 42.) Once again, counsel clearly argued both in his position on sentencing and at sentencing that

20

a below-guidelines sentence would satisfy the § 3553(a) factors.  To the extent that Copeland believes that counsel should have argued that he and Ms. Long should have received similar sentences, Copeland fails to identify a specific argument that counsel did not make that would have persuaded the Court that he and Ms. Long deserved the same sentence.  Copeland fails to show any deficiency of counsel or resulting prejudice and Claim Eight (c) will be dismissed.

Finally, Copeland argues that counsel rendered ineffective assistance by "[f]ail[ing] to object to [the] Court relying on impermissible factors to fashion" his sentence.  (*Id.* at 43.) Copeland contends that "[t]he Court threatened him in the courtroom saying he was making it worse for [him]self because Copeland started his letter to the Court by saying 'I am not a thief.'" (*Id.*)   Copeland fails to identify with any specificity what impermissible factor the Court purportedly relied upon in sentencing him to a within-guideline sentence.  Thus, he fails to demonstrate deficiency of counsel or resulting prejudice based on this vague, conclusory allegation. *Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding denial of § 2255 motion appropriate where it "stated only bald legal conclusions with no supporting factual allegations"); *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) (explaining that "vague and conclusory allegations contained in a § 2255 may be disposed of without further investigation" (citation omitted)).  Claim Eight (d) lacks merit and will be dismissed.[5]

---

[5] To the extent that Copeland suggests that the Court asked a question about receiving "bond funding from Kimberley Cain (KDC)," as Copeland explains, the Government clarified that Copeland was not being held liable for these funds. (ECF No. 82, at 43.)  Copeland fails to show that the Court relied on conduct that he was not charged for in fashioning his sentence, or what he wanted counsel to do in this instance.  Again, Copeland's claim is too vague and conclusory to demonstrate that counsel was deficient or that he was prejudiced.

In Claim Nine, "Movant Copeland argues that his former attorney provided him with ineffective assistance by erroneously advising him that there were no viable claims that could be raised on appeal in light of appeal waiver provision." (ECF No. 82, at 45.) Copeland argues:

> After Movant Copeland's federal sentencing he was disappointed in the lengthy sentence he received for his fraud case and expressed this to his former attorney and asked him what's next, however, his former attorney advised him that he had no viable grounds to appeal in light of the waiver provision and based upon that erroneous advisement Mr. Copeland did not instruct his former attorney to file a Notice of Appeal.
>
> In fact, as demonstrated within Grounds 1, 5, 6, and 8, should have been raised on Direct Appeal . . . .

(*Id.* at 47.)

"[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). This determination must take into account "all the information counsel knew or should have known." *Id.* (citation omitted).

If the attorney received no express instruction to file a notice of appeal, and no consultation has occurred, a court must determine "whether counsel's failure to consult with the defendant itself constitutes deficient performance." *Id.* at 478. The prejudice prong requires "that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal. If the defendant cannot demonstrate that, but for counsel's deficient performance, he would have appealed, counsel's deficient performance has not deprived him of anything, and he is not entitled to relief." *Id.* at 484 (citations omitted).

If consultation about an appeal has occurred, counsel performs deficiently only by failing to follow the defendant's express instructions with respect to an appeal. *Id.* at 478.

In his plea agreement, Copeland specifically waived his right to appeal any sentence within the statutory maximum or the manner in which that sentence was determined. (ECF No. 34 ¶ 5.) During his Rule 11 hearing he also agreed that he understood this waiver. (ECF No. 86, at 23.) Nevertheless, at the end of Copeland's sentencing, the Court explained: "Sir, you have 14 days to appeal this sentence to the U S Court of Appeals for the Fourth Circuit. If you want to do that, you have to file a notice of appeal. You don't have to pay any money. The Court of Appeals will appoint a lawyer on your behalf." (ECF No. 87, at 60.) Thus, the record reflects that Copeland was aware that he had a right to appeal.

Copeland admits that, after sentencing, he told counsel he was upset with the length of his sentence and asked counsel about next steps, but that he specifically "did not instruct his former attorney to file a Notice of Appeal." (ECF No. 82, at 47.) Copeland argues that he did not tell counsel to appeal based on counsel's statement that he had no viable grounds to appeal based on the appeal waiver. (*Id.*) Although the discussion here between counsel and Copeland, which is based solely on Copeland's telling, was not the most thorough consultation possible concerning an appeal, a consultation clearly did take place. Counsel was aware that Copeland waived the right to appeal his sentence or the manner in which it was determined, because it was below the statutory maximum, and therefore, counsel's advice about the appeal waiver was not inaccurate. The uncontroverted record demonstrates that counsel consulted with Copeland about an appeal after his sentencing because Copeland was unhappy with his sentence. Nevertheless, the record reflects that counsel received no express instruction to file a notice of appeal. Because consultation occurred and Copeland admits he never instructed counsel to appeal, counsel was not deficient for

23

failing to file an appeal. *Flores-Ortega*, 528 U.S. at 478. Accordingly, because Copeland fails to show that counsel was deficient or that he was prejudiced, Claim Nine lacks merit and will be dismissed.

## III.    ALLEGED PROSECUTORIAL MISCONDUCT

In Claim Five, "Movant Copeland argues that the Government violated his Fifth Amendment rights by the failure to disclose and the suppression of exculpatory evidence . . . and prejudice ensured in violation of the U.S. Supreme Court's ruling in *United States v. Bagley*, 473 U.S. 667, 682 (1985). (ECF No. 82, at 24.) Copeland lists "examples of *Brady* violations" that make little sense in the context of the set of facts supporting his guilt. (*See id.* at 26.) Copeland cites purportedly "[s]uppressed evidence" that "details the role of Kadan and Associates which allowed the Court to enhance Copeland's federal sentence," and "[s]uppressed evidence regarding Bobby Thomas one of their clients (investors) sent Kadan and Associates $80,000 in which Copeland was able to have Kadan and Associates to refund the entire amount," and "statements made to federal law enforcement and/or federal prosecutors by Copeland's clients (investors) who informed the Government exactly who was responsible for this conspiracy scam," and "suppressed critical evidence in which proves that Kadan and Associates and their affiliates Kimberly Cain of (KDC), had presented [Copeland] with an opportunity to pay back some of the clients." (*Id.* at 26–27.)

Although the Court has difficulty understanding Copeland's vague claim, in essence, Copeland appears to want to set aside his plea as involuntary based on allegedly exculpatory suppressed evidence. (*See id.* at 28.) *Brady v. Maryland*, 372 U.S. 83 (1963), and its progeny "require[] a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence." *United States v. King*, 628 F.3d 693, 701 (4th Cir.

24

2011).  Accordingly, in order to obtain relief under *Brady* a litigant must "(1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material." *Id.* (citing *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)).

As a preliminary matter, none of these examples appear to be "suppressed evidence," much less "exculpatory evidence," as Copeland suggests.  Rather, these examples appear to consist of information that Copeland was always aware of and wants to now use to continue to argue his innocence.  Moreover, the Court fails to discern, and Copeland fails to explain, how any of this allegedly suppressed information was material, as it has no bearing on the conduct to which Copeland pled guilty.

As explained previously, Copeland agreed that he repeatedly made three false statements to prospective buyers:  1) the advance fees paid by customers would be held in escrow or a secured trust account; 2) the customers' advance fees would be repaid in full if their loans did not fund within a set period; and 3) ARS was a private lender with no middleman.  Copeland again appears to argue that the broader scam that he was involved in with other individuals that were not indicted with Copeland was relevant to his guilt of those three types of false statements.  Simply put, it was not.

In sum, Copeland fails to demonstrate that the Government suppressed favorable evidence or that such evidence was material.[6]  Claim Five lacks merit and will be dismissed.

In Claim Six, "Movant Copeland argues firmly that the Government committed prosecutorial misconduct in which entitles Copeland to have Count 1, conspiracy to commit wire

---

[6] To the extent that Copeland wanted to conduct further discovery and question witnesses about certain documents, Copeland agreed that by pleading guilty he was giving up his right to subpoena witnesses, giving up his right to obtain certain documents or object to them, and giving up his right to see and question anyone who testified against him.  (ECF No. 86, 24–25.)

fraud guilty plea withdrawn and the indictment dismissed with prejudice in the matter herein."

(ECF No. 82, at 28.)  Copeland suggests that

> the government used the hardships of the victims from Kimberly Cain (KDC) to present to the judge where she received almost $1 million dollars from clients (investors) who sent her funds directly and the government deemed that they were not responsible for any of those funds because they did not receive anything from them.  But at the sentencing hearing AUSA Brian Hood presented the hardships from those victims as evidence to increase[] the sentence and restitution amount.

(*Id.* at 31.)  Copeland's claim here is factually inaccurate.  Copeland was not held accountable for losses to any of the victims before January of 2017 when Copeland stopped referring loans to Kimberly Cain and KDC.  Copeland was only held accountable for losses from the period beginning in January of 2017.  As there was no misconduct by the Government, this aspect of Claim Six fails.

> Copeland also argues that

> AUSA Brian Hood used false information from one of the individuals they interviewed who was Copeland's co-defendant['s] best friend who was Dawn Long's assistant at the payroll Margie Stonehouse and she stayed with Ms. Long [and] this individual was addicted to drugs and got caught using drugs in front of Ms. Long's son at that you had this individual leave her house.  This individual is a drug addict and told the Government complete lies in fact this individual had outstanding warrants; a history of drug abuse and has a criminal history but yet the Government still relied upon this individual's statements during Copeland's federal criminal proceedings.

(*Id.* at 31.)  The Court fails to discern, and Copeland fails to identify what false information he believes the Government used in his criminal proceedings or when and how it was used.  Copeland's allegations are too conclusory to state a claim for relief.  *See Sanders*, 373 U.S. at 19; *Dyess*, 730 F.3d at 359.  Accordingly, Claim Six lacks merit and will be dismissed.

In Claim Seven, "Movant Copeland argues firmly that ex parte communications occurred regarding his criminal case between the Court and AUSA Hood, thus, the Court's impartiality

26

might reasonably be questioned in violation of 28 U.S.C. [§] 455(a);[7] and his Fifth Amendment Due Process Clause rights." (*Id.* at 33.) Copeland contends that

> after his guilty plea proceedings on August 2, 2023, he had a conversation with a U.S. Marshal at the federal courthouse who specifically informed through their conversations that he had overheard Judge Gibney and AUSA Brian Hood discuss [Copeland's] case but he would not disclose the basis of that conversation to Copeland. At the time Copeland thought nothing of it until he later discovered through legal research . . . that such conversations absent the presence of his former attorney was ex parte communication in which is prohibited by law.

(*Id.* at 35.) Copeland fails to demonstrate that there were any improper ex parte conversations between the Court and AUSA Hood through these vague allegations. For this reason alone, this aspect of Claim Six fails. The Government notes for the record, however that it

> acknowledges that following COPELAND's sentencing hearing, not [his] guilty plea hearing, counsel for the government and the Court had a random encounter by the elevator as both individuals were departing the Courthouse. There was indeed small talk about the sentencing hearing that had just occurred, but there was nothing improper about that conversation. Moreover, that conversation occurred *after* the Court had already sentenced the defendant to a Guidelines range sentence. What is more, counsel for the government and the Court did not have any substantive, ex parte conversations about COPELAND's case at the time of the defendant's guilty plea proceedings, or for that matter at any other time during the pendency of the case.

(ECF No. 92, at 18–19.)

Copeland also suggests that the Court has personal bias towards him because during sentencing the Court "call[ed] him a thief when his federal case began and saying during a court

---

[7] The statute provides, in relevant part

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
   (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

28 U.S.C. § 455.

proceeding that 'I was living high off the hog,'" and the Court also stated that 'my other LLCs were probably not legitimate' [and] I tried to speak but was not allowed to." (ECF No. 82, at 36.) Copeland also faults the Court for ignoring his "character letters from prominent individuals by stating that 'they didn't know the real me.'" (*Id.*) None of these statements demonstrate an impermissible personal bias or prejudice of the Court, but instead were reactions to Copeland's continued denial of his guilt after he had pled guilty.

The Court has already addressed these arguments and found them meritless. As explained to Copeland previously,

> Petitioner claims that the undersigned called him a "thief" twice during his criminal proceedings, ignored his character evidence at sentencing, and sentenced him to a longer sentence than his co-defendant, which shows that the undersigned is personally biased against him. ([ECF No. 83,] at 3–4.) The bar for recusal is high, however, as "courts have only granted recusal motions in cases involving particularly egregious conduct." *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011)). In addition, "judicial rulings alone almost never constitute a valid basis for bias" or a valid reason to demand recusal of a judge. *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citation omitted). Petitioner has not demonstrated that the Court harbors any bias against Petitioner or any circumstance where the impartiality of the undersigned might be reasonably questioned. Accordingly, the Motion for Partial Disqualification, (ECF No. 83), is DENIED.

(ECF No. 84, at 2.) Copeland fails to demonstrate that the Court has personal bias against him or that there is any justifiable reason to question the Court's impartiality. Accordingly, Claim Seven lacks merit and will be dismissed.

## IV.    CONCLUSION

The § 2255 Motion (ECF No. 82) will be DENIED. Copeland's claims and the action will be DISMISSED. Because the Court has decided Copeland's motion it will DENY AS MOOT his

pending motion for prompt disposition. (ECF No. 99.) A certificate of appealability ("COA")

will be DENIED.[8]

An appropriate Final Order shall accompany this Memorandum Opinion.

/s/

John A. Gibney, Jr.
Senior United States District Judge

Date: 9 July 2026
Richmond, Virginia

---

[8] An appeal may not be taken from a final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Copeland has not met this standard.

29